IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JULIE KRING-SCHREIFELS | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| KILOLO KIJAKAZI, Acting | : | NO.  22-110 |
| Commissioner of Social Security | : | |

**MEMORANDUM AND ORDER**

ELIZABETH T. HEY, U.S.M.J.                                     April  26, 2023

Julie Kring-Schreifels ("Plaintiff") seeks review of the Commissioner's decision

denying her application for disability insurance benefits ("DIB").  For the reasons that

follow, I conclude that the decision of the Administrative Law Judge ("ALJ") is

supported by substantial evidence.

## I.      PROCEDURAL HISTORY

Plaintiff protectively filed for DIB on September 17, 2019, alleging that her

disability began on May 31, 2019, as a result of Parkinson's Disease, left side body

weakness, extreme chronic fatigue, chronic migraines, depression, and anxiety.  Tr. at 66,

148, 169.[1]  Plaintiff's application was denied initially, id. at 83-86, and on

reconsideration, id. at 88-90, and Plaintiff requested a hearing before an ALJ.  Id. at 91-

92.  After holding a hearing on May 5, 2021, id. at 29-46, the ALJ found on May 28,

---

[1]To be entitled to DIB, Plaintiff must establish that she became disabled on or
before her date last insured ("DLI").  20 C.F.R. § 404.131(b).  The Certified Earnings
Record indicates and the ALJ found that Plaintiff was insured through March 31, 2023.
Tr. at 17, 150.  I note that both the Disability Determination Explanations at the initial
and reconsideration levels mistakenly indicate that Plaintiff's DLI is March 31, 2022.  Id.
at 53, 67.

2021, that Plaintiff was not disabled.  Id. at 15-25.  The Appeals Council denied

Plaintiff's request for review on November 12, 2021, id. at 1-3, making the ALJ's May

28, 2021 decision the final decision of the Commissioner.  20 C.F.R. § 404.981.

Plaintiff commenced this action in federal court on January 11, 2022, Doc. 1, and

the matter is now fully briefed and ripe for review.  Docs. 6-8.[2]

## II.   **LEGAL STANDARDS**

To prove disability, a claimant must demonstrate an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment . . . which has lasted or can be expected to last for . . . not less than twelve

months."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process,

evaluating:

> 1.      Whether the claimant is currently engaged in substantial gainful activity;
>
> 2.      If not, whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities;
>
> 3.      If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings"), 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;
>
> 4.      If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform her past work; and

---

[2] The parties consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  See Standing Order, In RE:  Direct Assignment of Social Security Appeals to Magistrate Judges – Extension of Pilot Program (E.D. Pa. Nov. 27, 2020); Doc. 4.

> 5.      If the claimant cannot perform her past work,
> then the final step is to determine whether there is other work
> in the national economy that the claimant can perform.

See Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014); see also 20 C.F.R.

§§ 404.1520(a)(4), 416.920(a)(4).  Plaintiff bears the burden of proof at steps one through

four, while the burden shifts to the Commissioner at the fifth step to establish that the

claimant is capable of performing other jobs in the local and national economies, in light

of her age, education, work experience, and RFC.  See Poulos v. Comm'r of Soc. Sec.,

474 F.3d 88, 92 (3d Cir. 2007).

The court's role on judicial review is to determine whether the Commissioner's

decision is supported by substantial evidence.  42 U.S.C. § 405(g); Schaudeck v. Comm'r

of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is

whether there is substantial evidence to support the Commissioner's conclusion that

Plaintiff is not disabled.  Substantial evidence is "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion," and must be "more than a mere

scintilla."  Zirnsak, 777 F.2d at 610 (quoting Rutherford v. Barnhart, 399 F.3d 546, 552

(3d Cir. 2005)); see also Biestek v. Berryhill, __ U.S. __, 139 S. Ct. 1148, 1154 (2019)

(substantial evidence "means only – 'such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion'") (quoting Consol. Edison Co. v. NLRB, 305

U.S. 197, 229 (1938)).  The court has plenary review of legal issues.  Schaudeck, 181

F.3d at 431.

III.   **DISCUSSION**

A.   **ALJ's Findings and Plaintiff's Claims**

The ALJ found that Plaintiff's Parkinson's Disease is severe, <u>tr.</u> at 17, but that her migraines and depression are non-severe because they "do not cause more than minimal limitation in [Plaintiff's] ability to perform basic mental work activities." <u>Id.</u> at 18.  With respect to Plaintiff's non-severe depression, the ALJ found mild limitation in one of the four "paragraph B" criteria -- concentrating, persisting, or maintaining pace. <u>Id.</u> at 18-19.  The ALJ determined that Plaintiff does not have an impairment or combination of impairments that met the Listings, <u>id.</u> at 19, and that she retained the RFC to perform light work except that she can occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance, stoop, kneel, crouch, and crawl; and never work at unprotected heights, in humidity, or in wetness.  <u>Id.</u> at 20.  Based on the testimony of a vocational expert ("VE"), the ALJ found that Plaintiff could perform her past relevant work as an art teacher, which was a skilled job with a specific vocational preparation ("SVP") of 7, performed at the light level.  <u>Id.</u> at 24.  Therefore, the ALJ found that Plaintiff was not disabled from May 31, 2019, through May 28, 2021, the date of the ALJ's decision.  <u>Id.</u> at 25.

Plaintiff claims that the ALJ erred by failing account for the impact of Plaintiff's mild mental limitations in the RFC assessment and in determining that Plaintiff could return to her prior work as an art teacher.  Doc. 6 at 3-10.  In addition, Plaintiff complains that the Appeals Council had no authority to adjudicate Plaintiff's claim because the Acting Commissioner's appointment violated the Federal Vacancies Reform Act,

("FVRA"), 5 U.S.C. § 3346(a).  Id. at 10-14.[3]  Defendant responds that the ALJ did not

err by failing to account for Plaintiff's mild limitation in the RFC assessment.  Doc. 7 at

5-13.  Defendant also argues that Plaintiff's FVRA argument is in error.  Id. at 13-30.  In

reply, Plaintiff argues that the Administration cannot "rely upon the non-severe nature of

Plaintiff's mental impairments as a substitute for the reasoned analysis and narrative

required in formulating a claimant's RFC,"  Doc. 8 at 1, and provides additional

argument on the FVRA challenge.  Id. at 3-8.

> **B.**     **Plaintiff's Claimed Limitations and Testimony at the Hearing**

Plaintiff was born on December 17, 1956, making her 62 years of age at the time

of her alleged onset date (May 31, 2019), and 64 years of age at the time of the ALJ's

decision (May 28, 2021).  Tr. at 34, 148.  She has a Master's degree in art education, and

her past relevant work is as an art teacher.  Id. at 34-35, 42-44, 170.

Plaintiff stopped working in 2019, explaining that she suffered from bouts of

depression, extreme weakness in her left side, weakness in her voice, stiffness when she

wakes up, hyperhidrosis, posture issues, erratic sleep and difficulty holding things

because her "hand becomes filled with pins and needles.  Tr. at 36-37.  Plaintiff testified

that she did not have limitations in her self-care, but had to plan to do grocery shopping

when she is feeling up to it.  Id. at 38.  Plaintiff continued to exercise and testified that

she walked around the neighborhood.  Id. at 39-40.

---

[3]Plaintiff raised a constitutional challenge to the appointment of the Commissioner of Social Security in her opening brief.  Doc. 6 at 10-14 (citing Seila Law LLC v. Cons. Fin'l. Prot. Bur., 140 S. Ct. 2183 (2020)).  She withdrew this argument in her reply brief. Doc. 8 at 8.

Plaintiff testified that she could lift "[p]erhaps 20 pounds." Tr. at 41.  She continued to spend time painting at an art studio and took a class there, but noted increasing difficulty because it was on the third floor of the building.  Id.

The VE classified Plaintiff's work as an art teacher as light, skilled work.  Tr. at 43.  The ALJ asked the VE to consider someone of Plaintiff's age, education, and work experience, who could perform light work and occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance, stoop, kneel, crouch, and crawl; and never work at unprotected heights, or in humidity and wetness.  Id. at 44-45.  The VE testified that such a person could perform Plaintiff's past relevant work.  Id. at 45.  When questioned, the VE also testified the person was limited to sedentary work, she would not be able to perform the past relevant work, and that no jobs would be available if the person was off task for 15% of the day or more.  Id.

**C.**    **Summary of the Medical Record**[4]

Plaintiff has a history of Parkinson's Disease and treated with Daniel E. Kremens, M.D., at Jefferson Neurology.  Tr. at 251-78, 294-486, 510-32.  Dr. Kremens summarized Plaintiff's symptoms as weakness, muscle rigidity, motor fluctuations, dykinesias, difficulty with gait, fatigue, hypophonia, hyperhidrosis, and mood changes.  Id. at 534.  In his treatment notes, Dr. Kremens noted that Plaintiff had a history of major depressive disorder ("MDD") and insomnia.  Id. at 278 (2/5/18 – clonazepam for insomnia and

---

[4]Plaintiff's substantive challenge to the ALJ's decision involves Plaintiff's limitation in concentrating, persisting, and maintaining pace.  Thus, I will focus on the evidence relevant to those areas.

Lexapro for depression[5]), 272 (8/2/18 – insomnia is "[g]enerally improved," and discussed increasing Lexapro to address mood), 266 (12/3/18 – improved mood with increased Lexapro), 261 (6/4/19 – improved mood), 255 (12/23/19 – insomnia is generally improved, mood is significant issue, recommend patient find a psychiatrist), 366 (5/18/20 – mood improved with addition of bupropion and switch to Mirapex[6]), 515 (2/23/21 – mood is improved with addition of bupropion and switch to Mirapex).[7]

Dr. Kremens completed a Medical Source Statement on April 27, 2021, in which he provided an assessment of Plaintiff's physical abilities and limitations.  Tr. at 533-34. Dr. Kremens noted that Plaintiff "frequently" experienced pain or other symptoms severe enough to interfere with "attention and concentration needed to perform even simple work tasks," and needed an allowance for frequent breaks due to unpredictable wearing off of her medications.  Id. at 534.

---

[5]Clonazepam (brand Klonopin) is a benzodiazepine used to treat seizure disorders and panic disorder, including agoraphobia.  See https://www.drugs.com/clonazepam.html (last visited April 19, 2023).  Lexapro is an antidepressant.  See https://www.drugs.com/lexapro.html (last visited March 30, 2023).

[6]Bupropion (brand Wellbutrin) is an antidepressant.  See https://www.drugs.com/bupropion.html (last visited Mar. 30, 2023).  Mirapex acts like natural dopamine and is used to treat symptoms of Parkinson's Disease including stiffness, tremors, muscle spasms, and poor muscle control.  See https://www.drugs.com/mirapex.html (last visited Mar. 30, 2023).

[7]Dr. Kremens frequently referred to Plaintiff's treatment with a therapist, see, e.g., tr. at 363 (5/18/20 – "continues to follow with her therapist"), 512 (2/23/21 – "follows with her therapist").  In addition, during a March 3, 2020 consultative mental examination, Adrienne Gallo, Psy.D., noted that Plaintiff had seen Dr. Joan Conway once every two to three weeks since 2012.  Id. at 282.  No therapist's notes are in the administrative record.

On January 4, 2019, Plaintiff's primary care physician, Michelle Ecker, M.D., noted Plaintiff's complaints of left-sided weakness, slow movement and decreased agility of the left hand, and depression.  Tr. at 498.  With respect to depression, Dr. Ecker noted that MDD was in full remission and Plaintiff should continue with her medications.  Id. at 499.  On January 9, 2020, on a depression screening instrument,[8] Plaintiff reported to Dr. Eckert that she had trouble concentrating more than half the days.  Id. at 491.  Dr. Eckert diagnosed Plaintiff with a moderate episode of recurrent MDD, and started Plaintiff on bupropion.  Id. at 492.  On May 29, 2020, Dr. Ecker note that Plaintiff's depression was "much improved with addition of Wellbutrin, she is back to baseline, animated, good mood."  Id. at 487.  In addressing Plaintiff's "Moderate episode of recurrent [MDD]," the doctor noted "excellent control on this regimen[,] will reeval in 4 months."  Id. at 488.

On March 3, 2020, Dr. Gallo conducted a Mental Status Evaluation, during which she found Plaintiff's attention and concentration were "mildly impaired due to nervousness," noting that Plaintiff could perform simple calculations and serial 2s from 20, but was unable to complete serial 7s from 100.  Tr. at 284.  Similarly, Plaintiff's

---

[8]The Patient Health Questionnaire-9 ("PHQ-9") asks the patient to report how often in the prior two weeks he or she has been bothered by nine specific depressive symptoms.  See https://www.apa.org/depression-guideline/patient-health-questionnaire.pdf (last visited March 30, 2023).  The patient uses a four-point scale to rate each symptom:  not at all (0), several days (1), more than half the days (2), nearly every day (3).  Id.  The total of the scores is used to determine the severity of depression: 1-4 is minimal; 5-9 is mild; 10-14 is moderate, 15-19 is moderately severe; and 20-27 is severe.
https://med.stanford.edu/fastlab/research/imapp/msrs/_jcr_content/main/accordion/accordion_content3/download_256324296/file.res/PHQ9%20id%20date%2008.03.pdf (last visited March 30, 2023).  Plaintiff scored a 13, indicating moderate depression.  Tr. at 491.

recent and remote memory were "mildly impaired due to nervousness." Id. Dr. Gallo diagnosed Plaintiff with unspecified depressive disorder and noted Plaintiff's Parkinson's Disease. Id. The doctor found that Plaintiff's abilities to understand, remember, and carry out instructions; interact appropriately with supervisors, co-workers, and the public; concentrate, persist, or maintain pace; and adapt or manage oneself were not affected by her impairments. Id. at 286-87.

On March 12, 2020, at the initial consideration stage, John Vigna, Psy. D., diagnosed Plaintiff with depressive, bipolar, and related disorders, and Parkinson's Disease, based on his review of the record. Tr. at 58-59. Dr. Vigna determined that Plaintiff's mental health impairments were not severe and that Plaintiff had mild limitation in the abilities to understand, remember, or apply information and to concentrate, persist, or maintain pace, and no limitation in the abilities to interact with others and adapt or manage oneself. Id. Similarly, on September 22, 2020, on reconsideration, Shelley Harriet Ross, Ph.D., found from a review of the records that Plaintiff's mental health impairments were not severe and she had no limitation in the abilities to interact with others and adapt or manage oneself, and mild limitation in the abilities to understand, remember or apply information, and concentrate, persist, or maintain pace. Id. at 72-73.

### D.   Plaintiff's Claims

#### 1.   Mild Limitation in Concentration Missing from RFC Assessment

As previously mentioned, Plaintiff presents one substantive claim challenging the ALJ's decision. When the ALJ considered the B criteria of the mental health listings, she

determined that Plaintiff suffered from a mild limitation in concentrating, persisting, or maintaining pace.  Tr. at 19.  Plaintiff argues that the ALJ erred by failing to include any limitation in the questions posed to the VE or in the RFC assessment accommodating this mild limitation.  Doc. 6 at 3-10.  Plaintiff argues that this failure is particularly harmful in Plaintiff's case because the ALJ found that she can return to her skilled work as an art teacher.  Id. at 7.  Defendant argues that the ALJ properly explained her consideration of Plaintiff's mild limitation in concentration, persistence, and pace in crafting the RFC assessment and that recent caselaw supports the ALJ's analysis.  Doc. 7 at  5-9.

Before addressing Plaintiff's main argument -- that the RFC should have accommodated Plaintiff's mild limitations in concentration, persistence, or pace -- I address a suggestion in Plaintiff's argument that she has greater degree of limitation in this area.  Plaintiff relies on Dr. Kremens' indication in the Medical Source Statement that Plaintiff would frequently experience symptoms that would interfere with attention and concentration, Doc. 6 at 9 (citing tr. at 534), implying that the ALJ should have adopted more than a mild limitation in Plaintiff's ability to concentrate, perist, or maintain pace.  Defendant maintains that the ALJ properly considered Dr. Kremens' opinion.  Doc. 7 at 10.

The regulations governing the consideration of opinion evidence, which apply to Plaintiff's claim because it was filed after March 27, 2017, focus on the persuasiveness of each medical opinion.

> We will not defer or give any specific evidentiary weight,
> including controlling weight, to any medical opinion(s) or

prior administrative medical finding(s), including those from
your medical sources.

20 C.F.R. § 404.1520c(a).[9]  The regulations list the factors to be utilized in considering

medical opinions:  supportability, consistency, treatment relationship including the length

and purpose of the treatment and frequency of examinations, specialization, and other

factors including familiarity with other evidence in the record or an understanding of the

disability program.  Id. § 404.1520c(c).  The most important of these factors are

supportability and consistency, and the regulations require the ALJ to explain these

factors, but do not require discussion of the others.  Id. § 404.1520c(b)(2).  The

regulations explain that "[t]he more relevant the objective medical evidence and

supporting explanations presented by a medical source are to support his or her medical

opinion(s) . . . , the more persuasive the medical opinions . . . will be."  Id.

§ 404.1520c(c)(1) .  In addition, "[t]he more consistent a medical opinion(s) . . .  is with

the evidence from other medical sources and nonmedical sources . . . , the more

persuasive the medical opinion(s) . . . will be."  Id. § 404.1520c(c)(2).

        "The ALJ must consider all the evidence and give some reason for discounting the

evidence she rejects."  Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (citing

Stewart v. Sec'y HEW, 714 F.2d 287, 290 (3d Cir. 1983)).  When there is a conflict in the

evidence, the ALJ may choose which evidence to credit and which evidence not to credit,

_____

        [9]In contrast, the regulations governing prior applications spoke in terms of the
weight to be given each opinion, including controlling weight for the opinions of certain
treating sources.  20 C.F.R. § 404.1527.

so long as she does not "reject evidence for no reason or for the wrong reason."

Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005); see also Plummer, 186 F.3d at

429 (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993)).

Here the ALJ acknowledged Dr. Kremens' opinion that Plaintiff's symptoms

would frequently interfere with her focus and concentration.  Tr. at 24.  However, the

ALJ found the opinion unpersuasive, noting that it was not consistent with his own

treatment notes indicating an improvement in Plaintiff's mood and the fact that his

treatment notes "do not indicate that [Plaintiff] had issues with concentration or focus."

Id.  This conclusion is supported by substantial evidence as Dr. Kremens' treatment notes

did not indicate that Plaintiff had a problem with concentration.  Although Dr. Ecker's

notes indicate Plaintiff's self-reported difficulties with concentration when she had a

moderate episode of recurrent MDD, see id. at 491-92, four months later Dr. Ecker noted

that Plaintiff's depression was "much improved with [the] addition of Wellbutrin."  Id. at

494.  I find no error in the ALJ's consideration of Dr. Kremens' opinion.[10]

Plaintiff's overarching argument is that the ALJ erred by failing to incorporate the

mild limitations in concentration, persistence, and pace, in the RFC assessment and in

questioning the VE, and she provides citations to a number of cases both inside and

outside this jurisdiction supporting the proposition that and ALJ must include mild

mental limitations in the hypothetical and RFC assessment.  See Doc. 6 at 5-7.

---

[10]Dr. Gallo, the consultative mental examiner, found mild limitations in this area,
which the ALJ found persuasive.  Tr. at 23 (citing id. at 282-93).  Additionally, Drs.
Vigna and Ross found mild limitation in this area when they reviewed the record at the
initial and reconsideration stages, respectively.  Id. at 58 (Vigna), 73 (Ross).

Defendant argues that there is no categorical requirement that an RFC include limitations to accommodate a mild limitation in concentration, persistence, or pace, and that the ALJ's decision not to include one here is supported by substantial evidence.  Doc. 7 at 6-10.

The Third Circuit has explained the interplay between the paragraph B criteria, which are considered at steps two and three of the sequential evaluation, with the later RFC analysis, which is done at step four.

> [N]o incantations are required at steps four and five simply because a particular finding has been made at steps two and three.  Those portions of the disability analysis serve distinct purposes and may be expressed in different ways.  When mental health is at issue, the functional limitation categories are "used to rate the severity of mental impairment(s)[.]"  SSR 96-8p, 1996 WL 374184, at *4 (July 2, 1996).  While obviously related to the limitation findings, the RFC is a determination of "the most [a claimant] can still do despite [his] limitations" "based on all the relevant evidence in [the] case record."  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1); SSR 96-8p, at *2.  It "requires a more detailed assessment [of the areas of functional limitation] by itemizing various functions contained in the broad [functional limitation] categories[.]"  SSR 96-8p, at *4.  And, unlike the findings at steps two and three, the RFC "must be expressed in terms of work-related functions[,]" such as by describing the claimant's "abilities to:  understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting."  Id. at *6.  In short, the findings at steps two and three will not necessarily translate to the language used at steps four and five.

Hess v. Comm'r of Soc. Sec., 931 F.3d 198, 209 (3d Cir. 2019).  Thus, the ALJ's failure to include limitations related to mental impairments found mild at steps two and three

does not necessarily result in error at step four.  See Brumfield v. Saul, Civ. No. 19-4555, 2020 WL 4934315, at *8 (E.D. Pa. Aug. 21, 2020) (affirming where ALJ found mild limitations in paragraph B criteria at step two and RFC assessment did not include limitations related to non-severe mental impairments).

Despite the differences between the analyses at steps two and four, the findings at step two are "plainly relevant" to the ALJ's later step four analysis which involves 'the claimant's actual impairments.'" Brumfield, 2020 WL 4934315, at *4 (quoting Hess, 931 F.3d at 209).  The step four determination must be made after a narrative discussion that "'reflect[s] the claimant's particular impairments, including those embodied in the functional limitation findings' from the earlier steps." Id. (quoting Hess, 931 F.3d at 209).

In Brumfield, the court found no error in the ALJ's failure to include limitations related to non-severe mental impairments in the RFC assessment despite finding mild limitations in the paragraph B criteria at step two.  2020 WL 4934315, at *8.  The court determined that the ALJ properly considered the evidence regarding the claimant's mental health impairments, noting that such evidence was "sparse," "limited," and "overwhelmingly normal," id. at *6, *8, and that the ALJ "understood [the] impact [of the claimant's mental health impairments] before determining [the claimant's] RFC." Id. at *5.  In addition, the court observed that "[t]he ALJ also adequately conveyed the decision to not include any mental limitations in [the claimant's] RFC and the related hypothetical." Id.  Moreover, considering the sparsity of the mental health treatment

evidence, the court found that, even if the ALJ's consideration of the mild paragraph B findings at step four was incomplete, any error was harmless. Id. at *6.

Here, the ALJ reviewed the evidence relating to limits in Plaintiff's concentration, finding Dr. Gallo's assessment of mild limitation in concentration, persistence, and pace, persuasive as it was consistent with the doctor's examination and Plaintiff's "routine and conservative course of treatment, which, by [Plaintiff's] own report controlled her depressive symptoms." Tr. at 24. As previously noted, the ALJ found Dr. Kremens' assessment of greater problems with concentration unpersuasive, finding such conclusion inconsistent with the doctor's own notes and those of Plaintiff's primary care provider. Id.

In reviewing the B criteria of the mental health listings in determining the severity of Plaintiff's mental health impairments, the ALJ found that Plaintiff had no limitation in the functional areas of understanding, remembering, or applying information; interacting with others; and adapting or managing oneself, and a mild limitation in the area of concentrating, persisting, or maintaining pace. Tr. at 18-19.

> The third functional area is concentrating, persisting or maintaining pace. In this area, [Plaintiff] ha[s] a mild limitation. On examination in March 2020, [Plaintiff's] attention and concentration appeared mildly impaired due to nervousness in the evaluation. She completed counting, simple calculations, and serial threes from twenty. She was unable to complete serial sevens from 100 ([id. at 284]).
> . . . .
> Because [Plaintiff's] medically determinable mental impairment causes no more than "mild" limitation in any of the functional areas and the evidence does not otherwise indicate that there is more than a minimal limitation in

> [Plaintiff's] ability to do basic work activities, it is non-severe
> (20 C.F.R. [§] 404.1520a(d)(1)).

Id. at 19.

The ALJ also recognized and acknowledged the difference between the B criteria and the RFC assessment and affirmatively noted that she considered the limitation found in consideration of the B criteria in formulating the RFC assessment.

> The limitations identified in the "paragraph B" criteria are not a[n RFC] assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process.  The mental [RFC] assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment.  The following [RFC] assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

Id.

Finally, as in Brumfield, the ALJ "adequately conveyed the decision to not include any mental limitations in [the claimant's] RFC and the related hypothetical."  Brumfield, 2020 WL 4934315, at *5.  The ALJ here noted that she "has carefully considered the non-severe impairments in assessing the [RFC] and finds no specific functional vocational limitations beyond those outlined in the above-defined [RFC]."  Tr. at 24.

Because the ALJ adequately addressed the mental health treatment evidence in the record in concluding that the functional impact of Plaintiff's mental health impairment was so slight that it did not require inclusion in the RFC assessment or the hypothetical posed to the VE, tr. at 24, I find no error in the ALJ's analysis.  See Brumfield, 2020 WL 4934315, at *5-6; see also Northrup v. Kijakazi, Civ. No. 20-412, 2022 WL 889968, at *4-5 (M.D. Pa. Mar. 24, 2022) (ALJ did not err by not including limitations in RFC for

mild limitations in the B criteria where ALJ affirmatively explained that the RFC assessment incorporates the limitations found in the B criteria mental function analysis); Long v. Kijakazi, Civ. No. 20-1358, 2022 WL 609620, at *8 (D. Del. Jan. 31, 2022) (failure to include work-related limitations in the RFC was consistent with the analysis at step two finding only mild mental impairments), R&R adopted,  2022 WL 609160 (D. Del. Feb. 15, 2022); Hernandez v. Kijakazi, Civ. No. 22-1556, 2022 WL 17751355, at *9 (D.N.J. Dec. 19, 2022) (same); Tucker v. Saul, Civ. No. 18-13522, 2020 WL 6255420, at *19 (D.N.J. Oct. 23, 2020) (no error in failing to include mental limitations in RFC after finding adjustment disorder non-severe); Wardell v. Berryhill, Civ. No. 18-918, 2019 WL 1579501, at *7 (D. Del. Apr. 12, 2019) ("ALJ appropriately exercised her discretion to choose whether to include the mild limitations in concentration, persistence, or pace, found at step two, in the hypotheticals posed to the VE").[11]

---

[11]Plaintiff argues that the ALJ's failure to include any limitation on concentration is not harmless because the ALJ found that she could return to skilled work.  Doc. 6 at 5, 7.  Plaintiff cites to no categorial rule that a claimant with a mild limitation in this area is unable to perform skilled work.  Moreover, both Brumfield and Northrup involved mild limitations in concentration, persistence, and pace, and the ALJs found the claimants could return to past relevant work that was skilled.  Brumfield, 2020 WL 4934315, at *2, 5; see also Brumfield v. Saul, Civ. No. 19-4555, Doc. 11-2 at 43 (VE testimony that claimant's past work as collection clerk was skilled with an SVP of 5); Northrup, 2022 WL 889968, at *5 (claimant's past relevant work of performance manager was skilled work with an SVP of 9); O'Connor v. Comm'r of Soc. Sec, 466 F. App'x 96, 101-03 (3d Cir. 2012) (plaintiff could return to work as a public defender despite mild limitations in mental functioning due to anxiety).

2.    FVRA

In her legal challenge, Plaintiff argues that the ALJ and Appeals Council judges lacked authority to decide this matter because they were not properly appointed.  Doc. 6 at 13-14; Doc. 8 at 3-6.  Specifically, Plaintiff argues that because Nancy Berryhill became Acting Commissioner on January 20, 2017, and was authorized to serve in that role for only 210 days, her term as Acting Commissioner ended on November 16, 2017, and therefore all appointments she made between that date and June 17, 2019, when Andrew Saul became commissioner, are null and void.  Doc. 6 at 13.  Defendant argues that the ALJ and Appeals Council had authority to decide this matter, Doc. 7 at 14-22, and to hold otherwise would "create the administrative paralysis that Congress sought to avoid" with the passage of the FVRA.  Id. at 22.

The FVRA governs who has authority to serve as an acting official during a vacancy in a Senate-confirmed office.  The FVRA provides three options for designating an acting official.  First, the "first assistant" to the vacant office "shall perform[its] functions and duties."  5 U.S.C. § 3345(a)(1).  Second, the President may designate another Senate-confirmed official to assume the acting duties.  Id. § 3345(a)(2).  And third, the President may designate an officer or employee within the same agency to perform the acting duties, provided the individual satisfies the tenure and salary requirements of the statute.  Id. § 3345(a)(3).  An acting official serving under the FVRA may serve "for no longer than 210 days beginning on the date the vacancy occurs; or . . . once a first or second nomination for the office is submitted to the Senate, from the date

of such nomination for the period that the nomination is pending in the Senate."  Id.
§ 3346(a)(1)-(2).[12]

On December 23, 2016, President Barack Obama issued a memorandum order
establishing an order of succession for the Social Security Administration ("SSA")
pursuant to the FVRA, 5 U.S.C. § 3345(a).  See Providing an Order of Succession Within
the [SSA], 81 Fed. Reg. 96337 (Dec. 23, 2016) ("Succession Order").  Among other
things, the Succession Order specified that if the Commissioner and Deputy
Commissioner positions were both vacant, the Deputy Commissioner for Operations
would serve as Acting Commissioner.  Id. § 1(a).

In January 2017 -- during the transition period between the terms of President
Obama and President Donald Trump -- Deputy Commissioner Carolyn Colvin, who had
been appointed and confirmed by the Senate, resigned as Acting Commissioner of the
SSA, leaving both the Commissioner and Acting Commissioner offices vacant.
Consistent with the Succession Order, Deputy Commissioner for Operations Nancy
Berryhill began serving as Acting Commissioner, and she continued in that capacity until
November 16, 2017, when the Government Accountability Office indicated that she was

---

[12]For vacancies that occur during the first 60 days after a Presidential transition,
the 210-day period runs from the later of 90 days after inauguration or 90 days after the
date of the vacancy.  5 U.S.C. § 3349a(b).  If a first nomination does not result in a
confirmation, an acting official may serve for another 210 days, id. § 3346(b)(1), and
during the pendency of a second nomination.  Id. § 3346(b)(2)(A).  If the second
nomination also fails, the acting official may serve for another 210 days.  Id.
§ 3346(b)(2)(B).

in violation of the 210-day FVRA time restriction for acting officers.  See Dahle v.

Kijakazi, 62 F.4th 424 (8th Cir. 2023).[13]

President Trump nominated Andrew Saul to be Commissioner on April 12, 2018,

see Reddick v. Kijakazi, Civ. No. 21-1782, 2022 WL 16703903, at *13 (M.D. Pa. Oct. 7,

2022), R&R adopted, 2022 WL 16700395 (M.D. Pa. Nov. 3, 2022), at which time Nancy

Berryhill resumed her prior office as Acting Commissioner pursuant to section

3346(a)(2) -- the legitimacy of which is at issue here.  Acting Commissioner Berryhill

served in that capacity from April 12, 2018, until the Senate confirmed Mr. Saul as

Commissioner on June 4, 2019.  Id. § 3345(a)(2).[14]  It was during this period, on July 16,

2018, that Ms. Berryhill in her capacity as Acting Commissioner ratified the appointment

of ALJs and Appeals Council judges.  See Social Security Ruling ("SSR") 19-1p, "Titles

II and XVI:  Effect of the Decision in Lucia v. Securities and Exchange Commissioner

(SEC) on Cases Pending at the Appeals Council, 2019 WL 1324866, at *2 (March 15,

2019).[15]

---

[13]The 210-day period was extended by 90 days by virtue of section 3349a(b) because the vacancy existed during the 60-day period prior to inauguration.

[14]Mr. Saul remained Commissioner until President Joe Biden removed him on July 9, 2021, at which time Kilolo Kijakazi, as Deputy Commissioner, became Acting Commissioner.  See 42 U.S.C. § 902(b)(4) ("The Deputy Commissioner shall be Acting Commissioner . . . during the absence . . . of the Commissioner. . . ."); https://www.ssa.gov/agency/commissioner/ (last visited March 22, 2023).

[15]On June 21, 2018, the Supreme Court invalidated the appointment of SEC ALJs because they were not appointed consistent with the Appointments Clause.  Lucia v. SEC, 138 S. Ct. 2044 (2018).  Social Security Ruling 19-1p addressed the impact of Lucia on social security cases.

Relying on a district court decision from Minnesota, Plaintiff argues that the above chronology is flawed insofar as Ms. Berryhill was not statutorily authorized to serve as Acting Commissioner for the second period of time commencing on April 12, 2018, and that her subsequent ratification of the ALJs' and Appeals Council judges' appointments was therefore a nullity.  Doc. 6 at 13-14 (citing Brian T.D. v. Kijakazi, 580 F. Supp.3d 615 (D. Minn. 2022)).  In Brian T.D., the court held that the ALJ who heard T.D.'s case lacked authority to render a decision because Ms. Berryhill was not properly serving as Acting Commissioner when she issued the July 16, 2018 Order ratifying the appointment of ALJ and Appeals Council judges.  580 F. Supp.3d at 635-36.  The district court reasoned that Ms. Berryhill did not resume her position as Acting Commissioner when President Trump nominated Mr. Saul to be Commissioner (April 12, 2018) because the FVRA does not include a "spring-back" provision, and therefore Ms. Berryhill was not authorized to serve as Acting Commissioner beyond the 210-day limit, which had expired prior to the nomination of Mr. Saul.  Id. at 633-34.

On March 7, 2023, after the parties submitted their briefs in this matter, the Eighth Circuit reversed Brian T.D., finding that Ms. Berryhill was properly serving as Acting Commissioner when she issued the ratification order, and therefore the ALJ had authority to adjudicate the application for benefits.  See Dahle, 62 F.4th 424.  In doing so, the Eighth Circuit -- the only circuit court to have addressed the issue at the time -- joined numerous district courts which have uniformly (other than Brian T.D.) rejected the argument that Acting Commissioner Berryhill was serving in violation of the FVRA when she appointed ALJ and Appeals Council judges on July 16, 2018.  See, e.g., Ortiz

v. Comm'r of Soc. Sec., Civ. No. 21-5478, 2023 WL 2375580 (E.D.N.Y. Mar. 7, 2023);

Vanorden v. Comm'r of Soc. Sec., Civ. No. 21-19985, 2022 WL 17959586 (D.N.J. Dec.

27, 2022); Reddick, 2022 WL 16703903; Lance M. v. Kijakazi, Civ. No. 21-628, 2022

WL 3009122 (E.D. Va. July 13, 2022), R&R adopted, 2022 WL 3007588 (E.D. Va. July

28, 2022); Avalon v. Kijakazi, Civ. No. 21-2051, 2022 WL 1746976 (D. Nev. May 27,

2022).[16]  The conclusion reached by these myriad courts is consistent with principles of

statutory construction and the FVRA's legislative history, and also with the

commonsense need for the federal government to continue functioning, which underlies

the FVRA.

Proper statutory interpretation begins with the plain text of the statute.  Ross v.

Blake, 578 U.S. 632, 638 (2016); see also Idahoan Fresh v. Advantage Produce, Inc., 157

F.3d 197, 202 (3d Cir. 1998) ("The role of the courts in interpreting a statute is to give

effect to Congress's intent," and "it is presumed that Congress expresses its intent

through the ordinary meaning of its language.") (citations omitted).  The text of section

3346 reads as follows:

> (a) Except in the case of a vacancy caused by sickness, the
> person serving as an acting officer as described
> under section 3345 may serve in the office –
> (1) for no longer than 210 days beginning on the date the
> vacancy occurs; or
> (2) subject to subsection (b) [dealing with a pending
> nomination to fill the position], once a first or second
> nomination for the office is submitted to the Senate,

---

[16]On April 11, 2023, the Fourth Circuit also determined that Ms. Berryhill was
properly serving as the Acting Commissioner while Mr. Saul's nomination was pending
in the Senate.  Rush v. Kijakazi, __ F.4th __, 2023 WL 2877081, at *3 (4th Cir. Apr. 11,
2023).

> from the date of such nomination for the period that
> the nomination is pending in the Senate.

5 U.S.C. § 3346.  The word "or" between subsections (1) and (2) is the key term that

must be construed.  In <u>Dahle</u>, the Eighth Circuit interpreted the statutory language to

permit Ms. Berryhill to validly serve under both subsections (1) and (2).

> Subsections 1 and 2 operate independently, providing distinct
> limitations on when an individual who is qualified to serve
> under § 3345 may begin or end their service.  Subsection 1
> allows an individual to serve for 210 days after a vacancy
> occurs.  Subsection 2 allows an individual to serve from the
> time a nomination is sent to the Senate until that nomination
> is no longer pending.  Subsection 2 contains no time limit
> expressed in a number of days and speaks in no manner as to
> other requirements for a person to serve as an acting officer.
> Rather, it provides a time limit through reference to Senate
> action.  There is simply no textual basis to imply that
> subsection 1 and its 210-day limit somehow restrict a
> person's service under subsection 2.

<u>Dahle</u>, 62 F.4th at 427-28.  Thus, the term "or" does not preclude one who served under

subsection (1) from also serving under subsection (2).  <u>Id.</u> at 427.

This plain reading of the statute is supported by its legislative history.  The Senate

Government Affairs Committee report stated that an "acting officer may serve even if the

nomination is submitted after the 150 days has passed," S. Rep. No. 105-250, 1998 WL

404532, at *14 (July 15, 1998), and the only change between the proposed language

discussed in the Senate Report and the enacted version of the FVRA was an increase in

the number of days an individual could serve as an acting official, from 150 to 210 days.

<u>See</u> <u>Karen E. v. Kijakazi</u>, Civ. No. 21-3015, 2022 WL 17548642, at *17-18 (N.D. Iowa

Sept. 15, 2022).

Finally, if the FVRA were construed as Plaintiff suggests, an incoming President would be unable to name acting officers to numerous critical offices within the federal government because the 210-day service periods would lapse before the new President could submit nominations to the Senate.  Such an outcome would create a dysfunctional paralysis of government contrary to congressional intent.  See S. Rep. No. 105-250, 1998 WL 404532, at *18 (purpose of FVRA is to ensure that "[a]ll the normal functions of government could thus still be performed").

For the aforementioned reasons, pursuant to sections 3345 and 3346, Ms. Berryhill became Acting Commissioner for a second time on April 17, 2018, when Mr. Saul's nomination was presented to the Senate for confirmation, and she was properly serving as Acting Commissioner on July 16, 2018, when she ratified the appointments of the ALJ and Appeals Council judges.  Therefore, the ALJ and Appeals Council judges had proper authority to adjudicate Plaintiff's application for benefits.[17]

## IV.  **CONCLUSION**

The ALJ's decision is supported by substantial evidence.  The ALJ properly considered the opinion evidence, relying on inconsistencies in the treatment providers'

---

[17]In his reply brief, Plaintiff asks that even if Ms. Berryhill properly served as Acting Commissioner for two distinct periods of time (the first ending on November 16, 2017, and the second beginning on April 18, 2018), then "who was the Acting Commissioner of SSA between November 16, 2017 and April 17, 2018?"  Doc. 8 at 4.  The question is irrelevant for present purposes because, as explained above, Acting Commissioner Berryhill had proper authority to issue the July 16, 2018 Order ratifying the ALJ and Appeals Council judges by operation of statute.  5 U.S.C. § 3346(a)(2) (Acting Commissioner serves from time nomination is submitted to Senate until confirmation).

notes and inconsistencies with the record as a whole, in finding Dr. Kremens' opinion regarding limitations in Plaintiff's focus and concentration unpersuasive.  Considering the record as a whole and the dearth of evidence regarding any limitations in Plaintiff's concentration, persistence, and pace, the ALJ adequately explained her reasoning for failing to include any limitations related to Plaintiff's non-severe mental impairments her RFC assessment and the hypothetical upon which she relied.

In addition, I reject Plaintiff's argument that former Acting Commissioner Berryhill lacked authority under the FVRA to ratify the appointment of the ALJs and Appeals Council judges on June 16, 2018.

An appropriate Order follows.